## Case No. 3,399.

### CROCKER et al. v. LEWIS.

[3 Sumn. 1.][1]

Circuit Court, D. Maine. Oct. Term, 1837.

FRAUDULENT REPRESENTATIONS BY VENDOR—EVIDENCE—LETTERS.

1. A representation made to a stranger in respect to a sale and by him communicated to a third person, so as to become the basis of a purchase by the latter from the party making the representation, is not treated as res inter alios acta, but as if made directly by the vendor to the vendee.

[Cited in Mason v. Crosby, Case No. 9.235; Iowa Economic Heater Co. v. American Economic Heater Co., 32 Fed. 737.]

2. The negotiations and conversations. of a party charged with false and fraudulent representations allowed to be taken into consideration in order to determine the question of fraud.

3. The letter of a deponent having been offered in evidence, held that it was not admissible, except to contradict or qualify some of the statements made in his deposition.

4. Semble, where evidence is unimportant in its bearings, and unless clearly irrelevant, it is better to admit it at a trial, so as to avoid a motion for a new trial, in case of its rejection.

This was an action [by Uriel Crocker and others against William Lewis] on the case for an alleged fraud in the sale of a part of a township of land in the county of Kennebec, sold by the defendant to the plaintiffs. Plea, the general issue.

The declaration in substance stated that the said Lewis, at Portland, in the state of Maine, had contracted to purchase of one John Dunlap a part of a certain township of land, situated in the said state of Maine, to the amount of one half part thereof, and had contracted with the said John Dunlap to pay him therefor the sum of three dollars and thirty-seven cents per acre and no more, afterwards, to wit, on the eighteenth day of July, in the year of our Lord one thousand eight hundred and thirty-five, at Boston aforesaid, to wit, at said Bangor entered into and held with the said plaintiffs a conversation relative to the purchase of one third of said township, and with the fraudulent design and intention to induce the said plaintiffs to purchase and pay for at a large price, to wit, for the sum of five dollars and twenty-five cents per acre, one-third part of said township, then and there did wickedly, falsely, and fraudulently represent and declare to said plaintiffs, that he had contracted to purchase said township or a part thereof, and had given therefor the sum of five dollars and upwards per acre, and that said township was of great value, and that he the said Lewis did not wish to retain the whole of said purchase, and that he would sell and cause to be conveyed to the plaintiffs one

---

[1] [Reported by Charles Sumner, Esq.]

undivided third part of said township at the price aforesaid, to wit, for the sum of five dollars and twenty-five cents per acre, and did with the corrupt design aforesaid, and with the intent aforesaid, falsely and fraudulently further affirm to the plaintiffs and represent that he had explored said township, and that it would be for the plaintiffs a great bargain to purchase said one-third part of said township at the price aforesaid, to wit, five dollars and twenty-five cents, which was the same amount he, said Lewis, falsely and fraudulently affirmed and declared to the plaintiffs he had contracted to give therefor, and no more. And the plaintiffs aver, that, trusting to, and believing in, and relying on said false, fraudulent, and deceitful representations and declarations of the said Lewis as true, they did then and there contract with said Lewis to purchase one-third part of said township, at the price of five dollars and twenty-five cents per acre, amounting in all to the sum of twenty-nine thousand one hundred and forty-one dollars and fifty cents, and then and there in pursuance aforesaid and in fulfilment of said contract, into which the said plaintiffs were induced, by said false and fraudulent representations and declarations so as aforesaid made by said Lewis, to enter, they the said plaintiffs then and there paid to said Lewis the sum aforesaid. By means of which false and fraudulent misrepresentations and declarations so as aforesaid made by said Lewis to the plaintiffs, he the said Lewis has cheated and defrauded the said plaintiffs of a large sum of money, to wit, of the sum of eleven thousand one hundred and one dollars and fifty cents, being the difference between what he gave therefor and the sum of five dollars and twenty-five cents which by reason of said false and fraudulent misrepresentations and declarations so made as aforesaid, the plaintiffs were induced and persuaded to give therefor.

At the trial before Ware, District Judge, at the last May term, at Portland, a verdict was found for the plaintiffs. A motion was afterwards made by the defendant for a new trial; and which was now argued by Rogers for the new trial and by Deblois and Sprague against it. The questions argued respected the admission or rejection of certain evidence hereinafter stated; and it is not necessary therefore to report the other evidence in the cause.

At the trial, the plaintiffs offered in evidence the deposition of Gordon Winslow, of which the following is the most important part: "About the fifth day of May, 1835, I was recommended to call on Mr. William Lewis, the defendant, in relation to timber lands in Maine, as a suitable person to give me information on the subject. I asked him about a certain tract of land which I had in view and he said he knew nothing of that from his own knowledge, and then on the map he pointed to the Bow township and stated he had it in view or had the refusal of

it, I am not positive which, and if he could get enough to join him he should like to get the whole of it, as he thought it a great bargain, or words to that effect; he said he was not able to take the whole of it alone, he thought it the best bargain in the market. He said, if I was willing to take a portion of it, I might have it at the same price at which he obtained it. This was the substance of the conversation at that time. I gave no encouragement that I should take any part. I next met Mr. Lewis at Bangor about the 15th day of June, 1835. There I had some conversation with him in regard to the Bow township, and concluded to go on with him and see it. He gave me to understand that he had the refusal of it, in some way. We were on the township one night and one day, together with a person employed to explore it. I agreed to take a quarter of the township at six dollars an acre, that being the price which he gave me to understand he paid for it. This agreement was made at the township. We returned to Bangor, and bonds were made out, one bond for a deed of one quarter, and one bond for a quarter which I was at liberty to decline if I was inclined. This was about the 22d day of June. On this day I gave a note at fifty days for the first payment of one quarter of the township. Mr. Winslow here exhibited the note to the magistrate. I objected to paying interest on the note, but Mr. Lewis said he was paying interest and that I ought to pay interest, as I was to have the lands on the same terms he was; and the note was accordingly made with interest. I left Bangor soon after, expecting to dispose of the other bond which I had to a friend in New York, but he did not take it. On my return from New York I believe I met Messrs. Crocker and Brewster at Mr. Lewis's office in Boston, and offered them the bond at the same price at which I had it, they paying one half of my expenses in travelling and exploring; they did take it. Some time after Mr. Crocker mentioned to me that he understood that Mr. Lewis had bought the land at a less price than six dollars an acre. I had represented to them that I had obtained the bond on the same terms that Mr. Lewis had the land, as Mr. Lewis had previously stated to me. I told Mr. Crocker that that must be a mistake, and that I would see Mr. Lewis immediately. I went to his office and saw him, and stated to him what Mr. Crocker had said, and wished him to meet with Mr. Crocker and myself and talk the business over, that there might be a fair and full understanding. We met accordingly, I believe at Mr. Lewis's. The result of that conversation was that Mr. Lewis represented to us that the land cost him between five dollars and five dollars and a quarter an acre. That since his first representation he had got a deduction on the land. I told Mr. Lewis that for my part, if the land cost him over five dollars and within a fraction of five dollars and a quarter, I

should be willing to take a portion at five and a quarter. Mr. Lewis said if I would take one third and Mr. Crocker one third he would put it to us on those conditions in order that it might be in as few hands as possible. To this I agreed and wrote a memorandum of the agreement which was 'that we hereby agree to purchase each one third of the Bow township of Mr. William Lewis at five dollars and a quarter per acre.' I signed this the same evening. Mr. Crocker wished to see his partner before signing it, and as I have been told, he signed it the next morning. Mr. Crocker said, he was entirely unacquainted with timber land, and that he relied upon the judgment of Mr. Lewis and those who had explored the township. I distinctly understood from Mr. Crocker he expected to purchase the land on the same terms Mr. Lewis had, and that he did purchase it on those terms. At the same time I drew up the above memorandum I also drew up another paper in which Mr. Lewis agreed, to sell to Crocker and Brewster and myself at five dollars and a quarter an acre, one third each of the Bow township. That was signed by Mr. Lewis the same night. Mr. Lewis, in the course of the conversation, stated that he had been put to more trouble than we, and that he ought to make a little something, and we accordingly threw in the fraction, giving him the full sum of five dollars and a quarter per acre. I understood Mr. Lewis that he should make little or nothing. This was about the middle of July. Mr. Crocker and myself agreed to meet Mr. Lewis at Skowhegan Falls in Maine. We went with Mr. Lewis to the township and made a thorough exploration of it. We were there about the 20th of July. We met in Portland afterwards, and the writings were drawn. My deed was from Henry Ilsley of one third. I was informed by Mr. Lewis that Mr. Crocker's deed was from Mr. Dunlap. I learned that there was some difference between the dates and times of payment in Mr. Crocker's notes and mine, and when I spoke to Mr. Lewis about it he said it was because Mr. Dunlap had consented to it. My notes were dated the 22d day of June, agreeably to the first bond and to the agreement which was written at Mr. Lewis's counting-room."

The defendant objected to so much of this deposition as stated the conversations and negotiations between Winslow and Lewis on the 5th of May and the 15th of June, 1835, antecedent to the final agreement between Winslow and the plaintiffs, and Lewis, in which the plaintiffs were to purchase one third and Winslow one third of the land. The court overruled the objection and the whole deposition was read to the jury. Afterwards, in the progress of the trial, the defendant, Lewis, offered in evidence a letter from Winslow to him, dated Milford, July 5, 1836, in order to affect the credibility of the deposition of Winslow. The letter was as follows:—

"Dear Sir:—I wish to inquire of you concerning a point upon which Mr. Crocker and myself do not now entertain the same impressions. I will put my inquiries in a direct form, that they may be the better understood and answered without much trouble to yourself. 1. Did not Mr. Crocker, yourself, and myself, agree together to give, and did we not give to General Kinsman a verbal refusal of a certain portion of our parts of the Bow township at six dollars per acre, provided he should meet us at Portland, prepared to make payment at the time agreed upon? 2. If he had the land, was he not to return the money paid to him for exploring? 3. When we bonded the township at eight dollars per acre on our passage to Portland, did not Mr. Crocker very frequently and in strong terms express his regrets that we had given the general any encouragement to let him have a portion at six dollars? 4. Did he not say many times in your hearing that he hoped the general would not be able to get the money so as to be in Portland in season to claim his promise, as he had rather retain the land than dispose of it at six dollars? 5. Did not Mr. C. hasten to have the writing drawn within the given time and executed so that he might be off, saying the general might come afterward and claim his promised portion at six dollars? 6. Finally, was not six dollars per acre the price and the only price which Mr. Crocker, yourself and myself agreed upon, at which we were to let the general have a portion? I know not how it happens, but Mr. Crocker now talks on this subject very differently from what he ever did in my hearing when the agreement was made. If I rightly understood him—seems to think you had all to say and do and he did and said nothing himself, whereas if I rightly remember, he talked as fast and said as much as any one. He denies that he ever expected to receive six dollars per acre of the general if he met us at Portland, as per agreement. Doubtless he has reasons for rendering such testimony just at this time. I do not know, however, what they are. If you will express to me your views on this subject in answer to these questions, you will confer a favor on, yours, &c. [Signed] Gordon Winslow.

"P. S. Please send your reply by the first mail, if convenient. Yours, &c. G. W."

The plaintiffs objected to the admission of this letter; and it was rejected by the court. The ruling of the court upon these points constituted the grounds for a new trial upon which the argument was had.

STORY, Circuit Justice. Two points have been argued upon the motion for a new trial. The first respects the admission of the parts of the deposition of Gordon Winslow, to go as evidence to the jury, which were objected to by the defendant. The second respects the rejection of the letter of the same witness, which, it is supposed, had a

tendency to qualify the statements in the deposition. Upon the first point there does not seem to me to be any difficulty whatsoever. The real question between the parties at the trial was whether there had been any false and fraudulent representation by the defendant, that he had given five dollars an acre and upwards for the lands sold to the plaintiffs. Now, it is apparent from the whole evidence in the present case, that the representations made by Lewis in his conversations with Winslow were communicated by the latter to Crocker (the plaintiff) and constituted the ground upon which the plaintiff entered into the subsequent contract with Lewis. No principle seems better founded than this, that if a party makes a representation to one person in respect to a sale, and that representation constitutes the basis of a subsequent sale made, by the party so making the representation, to the party to whom it is communicated by the third person, it is treated in the same way as if directly made by the vendor himself. It is by no means true that representations made to third persons are to be treated as res inter alios acta, if those representations have been communicated and acted upon by another person, who places entire confidence in them. The case of Barden v. Keverberg, 2 Mees. & W. 63, 64, where the court thought that representations made by a married woman to third persons, that she was a feme sole might, if communicated to the plaintiff by such third persons, entitle him to the same benefit as if made to himself.

But in the present case, it is not necessary to rely on this ground; because, it is clear that the original contract made between Lewis and Winslow, and that made between the latter and the plaintiffs, for the purchase of the land, were for a different proportion from that, which was finally agreed upon by all the parties; and the conversations respecting the purchase between Lewis and Winslow were proper to explain the nature and character and circumstances under which the new contract, substituted for the original contracts between all the parties, and with the consent of all, was entered into. By the original contract Winslow with Lewis was to have a half, or a quarter, of the land, at his election. By the original contract of Winslow with the plaintiffs they were to take a quarter of the purchase. By the substituted contract, Winslow was to take one third, and the plaintiffs one third. And it seems to me that it was proper for the jury to take all the negotiations of the parties into consideration in order to determine whether the defendant had been guilty of the false and fraudulent representation complained of. Indeed, in a case of this sort, it may fairly be presumed that, if Lewis falsely and fraudulently misrepresented to Winslow the sum which he had given or was to give for the land, the presumption would be strong, that he would not hesitate to make a like misrepresentation to the plaintiffs. In this view the evidence was properly admissible, as corroborative evidence. But it appears to me, that there is very strong reason to believe, that Lewis, at the time when the final contract was made with the plaintiffs, had full knowledge that his prior conversations with Winslow had been communicated to the plaintiffs, and constituted the basis of their arrangements with Winslow. If so, there is the best reason why those conversations should be given in evidence to the jury. And under all the circumstances, it seems to me that it was fit for the jury to have the whole evidence before them, so that they might pass their judgment upon this very important fact.

As to the second point, the rejection of the letter of Winslow, it is very clear that it was not admissible, except for the purpose of contradicting or qualifying some of the statements made by Winslow in his deposition, and thus affecting the credibility of his testimony. For any other purposes, or to establish any other independent facts, it would not be admissible, as it would be mere hearsay, and not under oath. Now it is not pretended that there is any contradiction between that letter and Winslow's deposition. Is there, then, in it any qualification of his testimony which would justly affect his credibility? It is said, that the contents of the letter have a direct bearing on the answers of Winslow to the sixth and seventh cross interrogatories of the defendant, and show the influences under which Winslow gave his testimony. The sixth cross interrogatory (which was objected to by the plaintiffs) is, "Was not Mr. Crocker offered six dollars an acre for a part of his purchase by Mr. Kinsman, one of the explorers?" The answer is, "Mr. Kinsman was desirous of purchasing a quarter of the township, and if he took it the price was to be six dollars an acre. And it was agreed between Mr. Lewis, Mr. Crocker, and myself, that we should each let him have one twelfth of the whole, which would make a quarter. He was to have it, if he met us at Portland on a day appointed. He did not come to Portland, nor did he take the land." The seventh cross interrogatory is, "Did not Mr. Crocker say on our way to Portland, that he hoped Mr. Kinsman would not get to Portland in season to get the land of us, as he would rather keep the land than sell it at six dollars?" The answer is, "I understood him to say so. We all felt very well satisfied with the land at that time. We had bonded it at eight dollars, as abovementioned."

Now, it seems to me, that there is not the slightest qualification of the terms of these answers in any part of the letter written on the fifth of July, 1836. On the contrary the language of the letter entirely corroborates these answers. By "the general," in this letter it is admitted that Mr. Kinsman is meant; so that it is palpable, that the statement,

in the answers that Mr. Crocker was well satisfied with his bargain, and did not wish to sell to Kinsman at six dollars, is fully confirmed. In truth the letter contains no direct averment on the subject; but it only interrogates Lewis, as to certain supposed facts, which, from the manner in which the interrogatories are framed, taken in connection with the situation of the writer, it may fairly be presumed he believed to exist. If I had sat at the trial, it is not improbable that I should have leaned in favor of its admission, not because I should have thought that it shook the credibility of Winslow's testimony, for I think it corroborates it; but because where evidence seems unimportant in its bearings my inclination rather is to admit it, unless clearly irrelevant, in order to avoid a motion for a new trial, in case of its rejection. But, called upon at this time to consider its admissibility upon strict legal principles, my judgment is that it was rightly rejected.